John H. BANKS, Mary E. Banks, Robert Cunat, June M. Cunat, Ehret Michigan Trust, Greenbriar Development, George J. Gregule, Jr., Robert J. Kane, Patricia A. Kane, Frank F. Lahr, Charlotte D. Lahr, Notre Dame Path Association, Thelma McKay Trust, Robert F. Pancoast, Pamela S. Pancoast, Dorothy A. Renner, Yolanda P. Stevens, Marcia A. Wineberg, Richard Neuser, Donald R. Chapman, Gail L. Chapman, Frank J. Bunker, MD, L. Richard Marzke, Nancy A. Marzke, Gregory R. Bovee, Candace C. Bovee, J. Thomas Conklin Trust, James W. Errant and Elizabeth S. Errant Trust, Marc Del Mariani, Mary Del Mariani, Richard R. Carter, M. Lynn Carter, Michael R. Anderson, Janice Anderson, Carolynne K. Morvis Trust, Donald D. Miller, Judith E. Miller, Ruth C. Cosgrove Trust, Country, L.L.C., Leonard J. Smith, Herzl Ragins, MD, Roger B. Wilschke, Ann C. Wilschke, Kent Werger, Margaret Werger, Michael S. Walsh, Kay F. Varga aka Kay F. Smith, Victoria L. Jackson, Hyun S. Jyung Trust, Robert D. Melcher, and Maria Melcher, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

Nos. 01–5150 to 01–5185.

United States Court of Appeals, Federal Circuit.

DECIDED: Jan. 2, 2003.

John B. Ehret, of Olympia Fields, Illinois, argued for plaintiffs-appellants.

Jeffrey Bossert Clark, Attorney, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; Alan Brenner, and Kathryn E. Kovacs, Attorneys. L. Anthony Pellegrino, Assistant Counsel for Litigation, Army Corps of Engineers, Washington, DC. Of counsel was Sandra Slack Glover, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC.

Before MAYER, Chief Judge, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

John H. and Mary E. Banks, along with thirty-five other plaintiffs, seek review of final decisions of the United States Court of Federal Claims dismissing their individual complaints as barred by the statute of limitations. *See Banks et al. v. United States,* 49 Fed.Cl. 806 (2001). Because the plaintiffs' claims did not accrue more than six years before their filings, this court

reverses and remands for further proceedings.

## BACKGROUND

The thirty-six plaintiffs own property in Michigan along a four and one-half mile stretch of the eastern shoreline of Lake Michigan south of St. Joseph Harbor. On July 9, 1999, sixteen original plaintiffs, invoking jurisdiction under the Tucker Act, 28 U.S.C. § 1491, brought claims "based on the prohibition of the Fifth Amendment of the United States Constitution against taking of private property without just compensation." After the denial of class certification, additional plaintiffs were named and each of the thirty-six plaintiffs filed complaints in the Court of Federal Claims.

Plaintiffs allege that the defendant, through the Army Corps of Engineers ("Corps"), constructed and maintained jetties at the St. Joseph Harbor that have interfered with the natural littoral flow of sand and river sediment and caused damage to the lakebed, resulting in "a gradual and continued taking of their property without just compensation, and such taking is continuing intermittently without permanent stabilization." Plaintiffs complain that the construction and maintenance of the jetties have altered the supply of sand to the lakebed and interrupted the natural flow of sand from the north, resulting in a deficit of sand on the plaintiffs' property. Plaintiffs further complain that the dredging and barging of river and littoral sand has permanently removed sand from the littoral ecology and resulted in the down-cutting of the shoreline south of the St. Joseph Harbor at a rate of about two feet per year.

The Corps activities impacting the St. Joseph Harbor and shoreline began in the 1830s. *Banks,* 49 Fed.Cl. at 817. The Corps completed the construction of the St. Joseph Harbor jetties in 1903. Be-

tween 1950 and 1989, the Corps installed sandtight steel sheet piling to the jetties. The parties agree that erosion of the shorelines on the Great Lakes occurs naturally and is further exacerbated by the harbor jetties. *Id.* Specifically, the presence of the harbor jetties in St. Joseph Harbor "significantly increased the annual rate of shoreline erosion," which, without human intervention, occurs naturally at a rate of approximately one foot per year. *Id.* at 815–16, 818. The Corps has "acknowledged the longstanding and significant exacerbation of erosion caused by its harbor jetties" since at least the mid–1970s. *Id.* at 817.

In an effort to address the additional erosion caused by the jetties, the Corps proposed to mitigate the erosion pursuant to Section 111 of the River and Harbor Act of 1968, 90 Pub.L. No. 90–483, § 111, 82 Stat. 731, 735 (1970). Section 111 authorizes the Secretary of the Army "to investigate, study, and construct projects for the prevention or mitigation of shore damages attributable to Federal navigation works." The Corps outlined its proposal in its Final Environmental Statement on the Mitigation of Shore Damage Attributed to the Federal Navigation Structures at St. Joseph Harbor, Michigan, dated November, 1974 ("Proposal"). The Corps' plan "propose[d] to mitigate shore erosion in the vicinity of St. Joseph Harbor … that is attributable to the Federal navigation structures at the harbor. Studies have determined that erosion attributable to the navigation project is approximately 30% of the total erosion due to all causes." The Proposal included the provision of feeder beaches "to nourish the areas suffering shore damage" in coordination with the annual dredging program. "[This] periodic nourishment plan … would give protection to the shore erosion area affected by the navigation structures and be within the limits of the Section 111 author-

ity. The only erosion that would then occur would be that due to natural processes."

The Corps' mitigation efforts involved more than fifteen years of beach nourishment with fine sand. *Banks,* 49 Fed.Cl. at 818. When the Corps determined that fine sand did not fulfill the role of coarser sediment, which has a longer retention time on the beach, the Corps deposited coarse material on the St. Joseph shoreline on five different occasions between 1986 and 1993 to better protect the underlying glacial till from erosion. *Id.* at 819. The mitigation efforts were expanded to placing barge-loads of large rocks into the lake in 1995. *Id.*

The evidence before the Court of Federal Claims included three technical reports issued by the Corps on the progress of the Corps' mitigation efforts in St. Joseph, which collectively indicate that the erosion was permanent and irreversible. The first of three technical reports, a June 1996 Technical Report on the Geologic Effects on Behavior of Beach Fill and Shoreline Stability for Southeast Lake Michigan ("1996 Report"), however, expressed some uncertainty as to the impact of the beach nourishment program at St. Joseph. The 1996 Report stated that the mitigation program "may provide at least partial protection to the underlying glacial till along and offshore of the feeder beach and waterworks revetment section of shore. It is unclear whether the beach nourishment is having any negative or positive impact along the 3.5–km revetment section of shoreline south of the waterworks."

A July 1997 Technical Report on the Effectiveness of Beach Nourishment on Cohesive Shores, St. Joseph, Lake Michigan ("1997 Report") acknowledged the irretrievable nature of the erosion while noting positive changes in the amount of sand in three zones south of St. Joseph. The 1997 Report noted "that the beach nourishment has been successful in maintaining the profile volumes in all three zones: beach/nearshore bar, offshore bar, and offshore." Specifically with regard to the period between 1964 and 1991, the 1997 Report noted that the "trend for this period suggested that the Section 111 Program was successful in mitigating the lake bed lowering rates" for at least some of the sectors south of the harbor. A January 2000 FY–1999 Annual Report on the Section 111 Beach Nourishment Monitoring Program ("1999 Report") emphasized the irreversible and potentially permanent nature of the erosion.

The defendant moved to dismiss for lack of jurisdiction, alleging that any takings occurred more than six years prior to plaintiffs' complaints, and the plaintiffs' complaints, therefore, were untimely under the statute of limitations of 28 U.S.C. § 2501. The plaintiff landowners argued that their cause of action for a continuing taking did not accrue until the late 1990s, when they learned that the observed shoreline erosion was permanent and irreversible. *Banks,* 49 Fed. Cl. at 812. The Court of Federal Claims granted the motion to dismiss, finding that plaintiffs' claims arose no later than 1989—the date the Corps completed the steel sheet piling of the jetties. *Id.* at 815, 824–25.

Plaintiffs appealed. This court has exclusive appellate jurisdiction. 28 U.S.C. § 1295(a)(3) (2000).

## DISCUSSION

### A. Standard of Review

■ This court reviews de novo decisions of the Court of Federal Claims on matters of law and reviews for clear error findings of fact. *Yancey v. United States,* 915 F.2d 1534, 1537 (Fed.Cir.1990). Therefore, this court reviews the Court of Federal Claims' decision to dismiss de

novo while its jurisdictional findings of fact are reviewed for clear error. *See Applegate v. United States*, 25 F.3d 1579, 1581 (Fed.Cir.1994).

### B.  Analysis

■ The issue before this court on appeal is whether the Court of Federal Claims erred in finding that the plaintiffs' claims fell outside the applicable statute of limitations. Generally, claims against the government must be filed "within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The accrual of a takings claim where the government leaves the taking of property to a gradual physical process occurs when the situation has "stabilized." *See Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir.2000). "[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Id.* at 1370–71.

■ The plaintiffs argue that the permanence of any damage to their property attributable to the Corps' activities in St. Joseph remained uncertain until the late 1990s. Plaintiffs contend that this uncertainty resulted from the potential for mitigation of any damage by the Corps' nourishment and sand transfer plan and from the fact that the subsurface processes responsible for the erosion of their shorelines were not understood. Plaintiffs also assert that the government concealed the existence of a takings claim and that the Court of Federal Claims relied on evidence that did not apply to their particular property. The defendant argues, and the Court of Federal Claims found, that by 1989, the Corps' actions resulted in a permanent taking of which plaintiffs were on inquiry notice and the extent of the damage was reasonably foreseeable. *Banks*, 49 Fed.Cl. at 806.

The Supreme Court, in *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), set forth the standard for accrual in cases alleging takings of a continual nature. In *Dickinson*, the government constructed a dam along the Kanawha River in West Virginia. The dam caused the water level to gradually rise between the time the dam began impounding water on October 31, 1936, and the time the river crested on September 22, 1938. Owners of land along the river filed suit against the United States for a taking caused by the permanent flooding of their land. Plaintiffs filed their suit more than six years after the dam began impounding water but less than six years before the river crested. The United States argued that their claim was untimely. The Court held that plaintiffs' claims for a taking were not barred by the statute of limitations and that plaintiffs could postpone suit "until the situation becomes stabilized," i.e., "until the consequences of [the government action] have so manifested themselves that a final account may be struck." *Id.* at 749, 67 S.Ct. 1382.

In *Applegate v. United States*, 25 F.3d 1579 (Fed.Cir.1994), this court analyzed the stabilization doctrine set forth in *Dickinson* as it applied to situations in which the government was attempting to mitigate actions that would otherwise constitute a permanent taking. In *Applegate*, the government constructed a deep-water harbor along the east coast of Florida just south of Cape Canaveral. The construction included the erection of jetties and the dredging of a channel through a barrier island. From the project's inception in 1952 through the 1990s, the project caused the shoreline of plaintiffs' property to recede due to the interruption of the littoral flow of sand. Throughout that period, the government made a number of different promises to the landowners to mitigate their losses. In 1962, Congress authorized

over five million dollars to construct a sand transfer plant, which would restore the littoral flow of sand and begin the process of rebuilding the lost beaches. In 1968, the Senate Public Works Committee and the Florida Department of Natural Resources approved a Corps plan to restore the beaches.

Throughout the 1970s, the Corps announced different delays in the building of the sand transfer plant. In 1988, the Corps again proposed plans for a sand transfer plant. By 1992, the sand transfer plant had not yet been built, and plaintiff landowners filed suit alleging a taking. The government moved to dismiss, arguing that the suit was untimely under the six-year statute of limitations. This court held that the alleged taking did not stabilize more than six years before the filing of plaintiffs' claims where "[t]he gradual character of the natural erosion process set in motion by the Corps, compounded by the Government's promises of a sand transfer plant, have indeed made accrual of the landowner's claim uncertain." *Id.* at 1582.

The court emphasized the slow and gradual "continuous physical taking process" and the Corps' promise of a sand transfer plant. "Authorized in 1962 and proposed again in 1988, the sand transfer plant would reverse the continuous erosion process. With a sand transfer plant in place, the landowners would encounter little, if any, permanent destruction of their shoreline property." *Id.* Because of these renewed promises, "the landowners did not know when or if their land would be permanently destroyed." *Id.* Thus, "uncertainty has stayed accrual of the claim" where the "Government's promises to restore the littoral flow destroyed any predictability of the extent of damage to the land." *Id.* at 1583.

The Court of Federal Claims distinguished *Applegate* on the grounds that

"two critical factors" present in *Applegate* are not present here: "repeated and unequivocal promises by the Corps to cure the erosion problem and a congressional appropriation to cover the cost of the cure." *Banks,* 49 Fed.Cl. at 822. However, the Court of Federal Claims and defendant misread *Applegate* as requiring the presence of a legally binding promise or duty or a matter requiring a congressional appropriation. *Applegate* did not create congressionally-imposed-duty or congressional-appropriation exceptions to the statute of limitations in gradual takings cases. Rather, *Applegate* applied and further explicated general accrual principles. *See Boling,* 220 F.3d at 1371 (stating that *Dickinson* and its progeny recognize that gradual takings present special difficulties and "represent an application of general accrual principles, rather than a broad exception to them"). This court has noted that the "critical element that delayed stabilization in *Applegate* [is] the justifiable uncertainty about the permanency of the taking." *Id.* at 1372. We have further explained that "a claim stabilizes when the 'permanent nature' of the taking is evident." *Id.* (citing *Fallini v. United States,* 56 F.3d 1378, 1382 (Fed.Cir.1995)).

Applying these principles to the present case, the question is whether the "predictability [and permanence] of the extent of damage to the [plaintiffs'] land" was made justifiably uncertain by the Corps' mitigation efforts. *Applegate,* 25 F.3d at 1583. In *Applegate,* the mere promises of a sand transfer plant, held out by the Corps and repeatedly renewed but never implemented, indicated that "the landowners did not know when or if their land would be permanently destroyed." *Id.* at 1582. Here, even greater uncertainty was created by the Corps' mitigation plan. While the Corps in *Applegate* made promises of a mitigating sand transfer plant, the Corps in this case actually performed its mitiga-

tion activities for several years before the filing of this action. The record shows that the Corps dumped fine sand onto plaintiffs' properties several times over a twenty-three year period beginning in 1970. When the Corps determined that dumping fine sand was not working, it deposited coarse material on the shoreline five different times between 1986 and 1993. The Corps tried a different technique in 1995. The Corps' mitigation operations at St. Joseph appeared to successfully stave off the damaging effects of the jetties. With the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible. We are satisfied that the plaintiffs met their jurisdictional burden before the Court of Federal Claims on the basis of the justifiable uncertainty of the permanence of the taking caused by the actual mitigation efforts of the Corps. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). The statute of limitations did not begin to run until the Corps issued the 1996, 1997, and 1999 Reports. Because each report was issued less than six years before plaintiffs filed their complaints, each complaint was timely.

## CONCLUSION

Because the Court of Federal Claims misapplied the standard for claim accrual under *Applegate*, and because plaintiffs remained uncertain as to the permanent nature of the taking until the Corps reported that the erosion was permanent and irreversible, we conclude that the claims were not time-barred. We, accordingly, reverse the judgments dismissing the cases for lack of jurisdiction and remand for further proceedings. We need not and do not consider plaintiffs' alternative arguments regarding the timeliness of their complaints.

## COSTS

Costs are taxed against the government, to the extent authorized by law.

*REVERSED AND REMANDED.*