John H. and Mary E. BANKS,
et al., Plaintiff,

v.

The UNITED STATES, Defendant.

Stone, Errol L. and Susan H. As Trustees
of the Susan H. Stone Trust,
Plaintiff,

v.

The United States, Defendant.

Nos. 99–4451 L, 04–277 L.

United States Court of Federal Claims.

June 23, 2005.[1]

John B. Ehret, Olympia Fields, IL, for plaintiffs in No. 99–4451 L. Drew W. Marrocco, Washington, DC, for plaintiffs in No. 04–277 L.

David W. Spohr, Seattle, WA, with whom was Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

*OPINION AND ORDER*

HEWITT, Judge.

I. Background [2]

Plaintiffs are the owners of property in Michigan "along a four and one-half mile stretch of the eastern shoreline of Lake

---

1. By Order dated March 15, 2005, the court consolidated the related cases for the limited purpose of addressing the liability issues in the cases.

2. The factual distinctions between the *Banks* case and the *Stone* case are immaterial for purposes of the cross-motions before the court. For addi-

tional factual background, see *Banks v. United States*, 49 Fed.Cl. 806 (2001) (*Banks I*), rev'd, 314 F.3d 1304 (Fed.Cir.) (*Banks II*), cert. denied, 540 U.S. 985, 124 S.Ct. 486, 157 L.Ed.2d 376 (2003); *Banks v. United States*, 62 Fed.Cl. 778 (2004) (*Banks III*).

Michigan south of St. Joseph Harbor." *Banks v. United States*, 314 F.3d 1304, 1306 (Fed.Cir.2003) (*Banks II*); *Banks v. United States*, 62 Fed.Cl. 778, 778 (2004) (*Banks III*). Plaintiffs allege that the United States Army Corps of Engineers (Corps), by its construction and maintenance of certain jetties at St. Joseph Harbor, has effected a physical taking of plaintiffs' shoreline property. *Banks III*, 62 Fed.Cl. at 778–79. Plaintiffs specifically allege that the Corps' activities "have interfered with the natural littoral flow of sand and river sediment and caused damage to the lakebed" which has effected "'a gradual and continued taking'" by eroding plaintiffs' shoreline property. *See Banks II*, 314 F.3d at 1305; *Banks III*, 62 Fed.Cl. at 778–79.

In the 1830s, the Corps began activities that plaintiffs allege have affected St. Joseph Harbor and the eastern Lake Michigan shoreline to its south. *Banks II*, 314 F.3d at 1306. The Corps completed construction of the St. Joseph Harbor jetties in 1903. *Id.* "Between 1950 and 1989, the Corps installed sandtight steel sheet piling [encasements around] the jetties." *Id.* The parties agree that the harbor jetties have long exacerbated the naturally occurring erosion of the shorelines along the Great Lakes by "'significantly increas[ing] the annual rate of shoreline erosion.'" *Id.* (citation omitted). The annual rate of natural shoreline erosion, without human intervention, is approximately one foot per year. *Id.; see also Banks v. United States*, 49 Fed.Cl. 806, 815–16, 818 (2001) (*Banks I*). Since the mid–1970s, "[t]he Corps has 'acknowledged the longstanding and significant exacerbation of erosion caused by its harbor jetties.'" *Banks II*, 314 F.3d at 1306 (quoting *Banks I*, 49 Fed.Cl. at 817).

As the court stated in *Banks III*:

Pursuant to Section 111 of the River and Harbor Act of 1968, 90 Pub.L. No. 90–483, 82 Stat. 731, 735 (1970),[3] the Corps prepared a proposal in 1974 to mitigate the shoreline erosion attributable to the jetties

in St. Joseph Harbor. *Id.* The Corps' mitigation efforts included: (1) more than fifteen years of providing fine sand for "feeder beaches 'to nourish the areas suffering shore damage,'" *Banks II*, 314 F.3d at 1306–07, (2) depositing coarser sediments with longer retention time on the St. Joseph shoreline at least five times between 1986 and 1993, *see id.*, and (3) "placing barge-loads of large rocks into the lake in 1995." *Id.* at 1307. Three technical reports prepared by the Corps and issued respectively in 1996, 1997 and 1999 addressed the progress of the Corps' mitigation efforts in St. Joseph and "collectively indicate[d] that the [shoreline] erosion was permanent and irreversible." *Id.* at 1307. On appeal, the Federal Circuit found that "[w]ith the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report and 1999 Report collectively indicated ... the permanence of the [shoreline erosion]." *Id.* at 1310. Accordingly, the Court of Appeals concluded that because "[t]he statute of limitations did not begin to run until the Corps issued the 1996, 1997, and 1999 Reports[,] ... plaintiffs['] ... complaints ... [were] timely." *Id.* (reversing the trial court's decision in *Banks I*, 49 Fed.Cl. at 825, that the plaintiffs' claims accrued no later than 1989). 62 Fed.Cl. at 779. Based on the Federal Circuit's finding that plaintiffs' claims were timely because the claims did not accrue during the Corps' mitigation efforts while plaintiffs were "justifiably uncertain about the permanency of the erosion and the taking," *Applegate v. United States*, 25 F.3d 1579, 1583 (Fed.Cir.1994), the court, on remand, asked the parties to brief two issues:

(1) Over what period of time is a plaintiff's claim examined? Is the proper period of time from the date of a plaintiff's property acquisition until the claim accrual date of 1999 or is it some other period of time? Is the answer different for different plaintiffs depending on the date of the property acquisition?

---

**3.** Section 111 authorizes the Secretary of the Army "to investigate, study, and construct projects for the prevention or mitigation of shore damages attributable to Federal navigation works." The River and Harbor Act of 1968, 90 Pub.L. No. 90–483, § 111, 82 Stat. 731, 735 (1970).

(2) In measuring a plaintiff's erosive property loss caused by the activities of the Corps, on what date is the high water mark measured? Is the proper date to measure the high water mark the date of a plaintiff's property acquisition or is it some other date?

Order of 12/22/04 in *Banks* case.[4] The parties have filed cross-motions for partial summary judgment on these issues.[5] Further to the Federal Circuit's guidance in *Banks II*, and for the following reasons, the Banks plaintiffs' motion is GRANTED in part and DENIED in part, the Stone plaintiffs' motion is GRANTED in part and DENIED in part, and defendant's motion is GRANTED in part and DENIED in part.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coast Fed. Bank v. United States*, 323 F.3d 1035, 1037 (Fed.Cir.2003). A fact that might significantly affect the outcome of the litigation is material. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. When an underlying factual question arises in a case involving "complex scientific principles" or requiring expert witness testimony, summary judgment may be improper. *Howes v. Med. Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987). Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run, *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984).

"[W]hen appropriate to the circumstances," summary judgment may be rendered in a takings case. *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996). Rule 56 contemplates that the court may significantly promote the efficient administration of justice.").

**4.** By Order dated May 12, 2000, the court directed the parties to show cause why case of *Banks v. United States*, No. 99–4451 L should not proceed as an action under Rule 20(a) of the United States Court of Federal Claims (RCFC) permitting the joinder of multiple plaintiffs in one action arising out of the same occurrence which triggers some common issues of fact and law. The parties filed no objection to the court's proposal. The Banks plaintiffs include thirty-six plaintiff landowners. *See Banks II*, 314 F.3d at 1305.

Then, by Order dated March 15, 2005 in the case of *Banks v. United States*, No. 99–4451 L, and by Order dated March 15, 2005 in the indirectly related case of *Stone v. United States*, No. 04–277 L (in which Mr. and Mrs. Stone assert a takings claim), the court consolidated the Banks case and the Stone case for the limited purpose of addressing the liability issue. Prior to the consolidation of the two cases, however, the court directed counsel in the *Banks* case and authorized counsel in the *Stone* case to file briefing addressing the legal issues posed by the court. *See* Orders of 12/22/04 in *Banks* case and in *Stone* case. *See* Rule 40.2(b)(1) of the Court of Federal Claims (RCFC) ("Whenever ... two or more cases before the court ... present common issues of fact," the court may "transfer, consolidat[e], or ... adopt[ ] ... a coordinated discovery schedule [in the cases if such action] would

**5.** The briefing includes: Defendant's Motion for Partial Summary Judgment as to the Period of Claim Examination and the High Water Mark (Def.'s Mot.): Stone Plaintiffs' Opposition to Government's Motion for Partial Summary Judgment and Cross–Motion for Partial Summary Judgment as to the Period of Claim Examination and the High Water Mark (Stone Opp'n), Banks Plaintiffs' Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment as to the Period of Examination and the High Water Mark (Banks Opp'n); Banks Plaintiffs' Memorandum in Support of Their Cross[-]Motion for Summary Judgment as to the Period of Claim Examination and the High Water Mark (Banks Cross-Mot.); Defendant's Reply Memorandum in Support of Its Motion for Partial Summary Judgment as to the Period of Claim Examination and the High Water Mark and In Opposition to the *Banks* and *Stone* Cross Motions for Partial Summary Judgment (Def.'s Reply); Banks Plaintiff's Reply Memorandum in Support of Its Cross Motion for Partial Summary Judgment as to the Period of Claim Examination and High Water Mark (Banks Reply); and Stone Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Cross–Motion for Partial Summary Judgment (Stone Reply).

grant a partial summary judgment. *See* RCFC 56(d).

### B. Period of Time Over Which a Plaintiff's Claim Is Examined

 Citing to the Federal Circuit's decision in *Boling v. United States*, 220 F.3d 1365, 1371–73 (Fed.Cir.2000), defendant asserts that, "[i]n a physical takings case where the cause of th[e] alleged taking is a gradual erosion process, a claim accrues when erosion substantially and *permanently* encroaches a property." Def.'s Mot. at 3 (emphasis added). Defendant argues that the "permanency" element required for the accrual of a claim has two components: physical and legal. *Id.* "[A] taking becomes *physically permanent* when . . . '[t]he permanent nature of the taking [has become so] evident . . . that the land owner should have known that the land had suffered . . . damage.'" *Id.* (quoting *Boling*, 220 F.3d at 1373) (second alteration added) (emphasis added). Notwithstanding evidence of permanent physical damage, a takings claim may not accrue [legally] when a "regulatory agency has taken steps towards reversing erosion . . . [and] plaintiffs [are] 'justifiably uncertain about the permanency of the . . . taking.'" *Id.* at 4 (citing *Boling*, 220 F.3d at 1371–72 and quoting *Applegate v. United States*, 25 F.3d 1579, 1583 (Fed.Cir.1994)). The "legal permanency" required for the accrual of a takings claim cannot be determined during this period of justifiable uncertainty. *See id.*

Defendant asserts that the Federal Circuit's decision in *Banks II*, which "d[id] not . . . discuss the physical permanence issue," "disturbed" only the legal permanence aspect of this court's claim accrual analysis in *Banks I. Id.* at 5. Defendant reasons that, by failing to address the physical permanence issue, by "simply repeat[ing] the legal standard" for claim accrual set forth in *Boling* and in *United States v. Dickinson*,[6] and by focusing on the application of the principles set forth in *Applegate* to the facts of the case, the Federal Circuit determined only that "it was only the Corps' [mitigation] actions in the 1970s that could possibly have forestalled the accrual of [p]laintiffs' claims." *Id.* at 5–6.

Based on its reading of the Federal Circuit's decision in *Banks II*, defendant argues that the "justifiable uncertainty" created by the Corps' mitigation efforts "limited [plaintiffs' claims] . . . in two ways." *See* Def.'s Mot. at 2–3. First, defendant asserts that the takings claims are time-barred for those plaintiffs owning property on which " 'substantial encroachment' likely occurred more than six years before the Corps['] mitigation activities in the 1970s [that] created the uncertainty that justified [plaintiffs' delay in] filing claims." *Id.* at 2. Second, defendant asserts that "recovery [is] limited to [those] damages sustained [during] the 1990s" for those claims "not time-barred prior to the Corps' mitigation activity in [the] 1970s." *Id.*

The Banks plaintiffs disagree. The Banks plaintiffs argue that the Federal Circuit "did not distinguish between legal permanency and physical permanency" in *Banks II*. Banks Opp'n at 3. Accordingly, the Banks plaintiffs assert that they claim "only losses above (landward) of the ordinary high water mark . . . or horizontal high water mark as defined by *Owen [v. United States]*, 851 F.2d 1404, 1412 (Fed.Cir.1988) (en banc) at 'the time of [the] construction' and only losses which occurred during the period of their ownership." *Id.* at 7 (alteration added). The "time of construction" contemplated by the Banks plaintiffs is the thirty-nine year period, specifically between 1950 and 1989, during which the Corps installed steel sheet piling to the St. Joseph Harbor jetties. *See Banks II*, 314 F.3d at 1306; *see also* Banks Opp'n at 3 (describing the effect of the jetties, which the Banks plaintiffs alternatively refer to as piers, as "damm[ing] the littoral and river sand from the visible shoreline") and Banks Cross–Mot. at 2–3 (referring to the act of enclosing the St. Joseph Harbor piers "with steel sheet piling so as to seal the sand and divert it into deep water"). The Banks plaintiffs contend that "the period of examination is from the date of [property] purchase until the plaintiffs are paid." Banks Reply at 7.

The Stone plaintiffs argue that "[t]he government's legal permanence versus physical

**6.** 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (*Dickinson*).

permanence argument is a fiction" because the Federal Circuit considered and "rejected" defendant's statute of limitations argument in *Banks II* by specifically finding that " 'plaintiffs' claims did not accrue more than six years before their filings.' " Stone Opp'n at 4 (quoting *Banks II*, 314 F.3d at 1305). The Stone plaintiffs also argue that defendant's assertions that "justifiable uncertainty on the part of plaintiffs could only have occurred from 1970 forward [are] simply not accurate" because, "[a]lthough[ ] the actual mitigation efforts did not physically begin until the 1970s," a series of government studies regarding erosion control on Lake Michigan at St. Joseph harbor "[were] conducted well before 1970." *Id.* at 5. The Stone plaintiffs therefore contend that their takings claim in this case "accrued in January 2000 as decided by the Federal Circuit in *Banks [II]*." *Id.* at 6.

The Stone plaintiffs contend that "a plaintiff landowner is entitled to just compensation for any compensable erosion occurring after the owner purchased the property in question." Stone Opp'n at 3 (citing *Applegate v. United States*, 35 Fed Cl. 406, 418–21 (1996)). The Stone plaintiffs argue that a plaintiff who "may have purchased the property after the government action in question and after the erosion process had begun" is not barred "from recovering just compensation for that part of the ongoing or continued erosion that has occurred during his or her ownership of the property." *Id.* (citing *Applegate*, 35 Fed.Cl. at 415) ("The Fifth Amendment Takings Clause does not permit the Government to continually erode private property … and avoid compensation for actual loss because of an intervening transfer of title."). Thus, the Stone plaintiffs urge that, as a matter of law, they are "entitled … to just compensation for all erosion that has occurred as a result of the government's construction and maintenance of the St. Joseph Harbor jetties from 1981 [the date of their purchase of property on the shore of Lake Michigan] to the present." *Id.*[7]

The Federal Circuit stated in *Banks II*:

The accrual of a takings claim where the government leaves the taking of property to a gradual physical process occurs when the situation has "stabilized." "[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined."

314 F.3d at 1308 (quoting *Boling*, 220 F.3d at 1370–71). The Federal Circuit explained that *Applegate* "applied and further explicated general accrual principles" by stating that " 'justifiable uncertainty about the permanency of the taking' " may delay stabilization. *Id.* at 1309 (quoting *Boling*, 220 F.3d at 1372). Justifiable uncertainty about stabilization, in turn, delays the accrual of the takings cause of action. *See id.* at 1310.

Comparing the Corps' conduct in *Applegate* to the Corps' conduct in this case, the Federal Circuit found:

While the Corps in *Applegate* made promises of a mitigating sand transfer plant, the Corps in this case actually performed its mitigation activities for several years before the filing of this action. The record shows that the Corps dumped fine sand onto plaintiffs' properties several times over a twenty-three year period beginning in 1970. When the Corps determined that dumping fine sand was not working, it deposited coarse material on the shoreline five different times between 1986 and 1993. The Corps tried a different technique in 1995. The Corps' mitigation operations at St. Joseph appeared to successfully stave off the damaging effects of the jetties. With the mitigation efforts underway, the accrual of plaintiffs' claims remained uncertain until the Corps' 1996 Report, 1997 Report, and 1999 Report collectively indicated that erosion was permanent and irreversible.

*Id.* at 1309–10. The Federal Circuit thus concluded that "[t]he statute of limitations did not begin to run [for plaintiffs' claims] until the Corps issued the 1996, 1997, and 1999 Reports." *Id.* at 1310. Because the

---

7. The Banks plaintiffs also acknowledge that they "may not bring a claim for any land lost prior to the time they purchased their respective properties." Banks Opp'n at 6.

last of the three reports, the 1999 Report, was issued in January 2000 as the "FY–1999 [8] Annual Report on the Section 111 Beach Nourishment Monitoring Program," the effective date of claim accrual for plaintiffs' claims in this case is January 2000. *See id.*

The decision of the Court of Federal Claims in *Applegate* provides useful guidance for determining the proper period of time over which each plaintiff's claim in this case must be examined. The plaintiffs in *Applegate* were beachfront property owners south of Port Canaveral in Florida. 35 Fed.Cl. at 411. Plaintiffs filed suit in December 1992 alleging that the Corps' construction of the Canaveral Harbor Project during the 1950s caused erosion of plaintiffs' properties and thereby effected an uncompensated taking. *See id.* at 411–12. The Corps' Canaveral Harbor Project, which was intended "to provide a deep-water harbor ... immediately south of Cape Canaveral," involved the dredging of a channel in the Atlantic Ocean and the construction of "two jetties projecting from the shoreline eastward into the Atlantic Ocean." *Id.* at 411. The *Applegate* plaintiffs, all but one of whom acquired their property "at various times after construction began on the federal project," complained that the jetties and the periodic dredging of the channel effected a taking by blocking the flow of sand to their beachfront properties. *Id.*

Among the issues addressed by the court in *Applegate* was plaintiffs' claim that each landowner was "entitled to compensation dating back to the initial construction of the [Canaveral Harbor] Project, regardless of the date of [his or her property] purchase, because the alleged taking became permanent only after" each landowner acquired his or her property. *Id.* at 418–19. The *Applegate* plaintiffs specifically relied on *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), and *Cooper v. United States*, 827 F.2d 762 (Fed.Cir.1987), for the proposition that they could recover

"for any taking that anteceded their ownership because they, not their predecessors, [bore] the risk of permanent loss" from the gradual process of beach erosion caused by the Corps' Canaveral Harbor Project. *Id.* at 419. Noting that "[n]either *Dickinson* nor *Cooper* established that a claimant may recover damages for a taking of property that occurred prior to his ownership," the court rejected the plaintiffs' proposition. *Id.* at 420. The court cited the Fifth Amendment and case law directing the payment of just compensation for the taking of private property to the owner of the property at the time of the alleged taking. *Id.* at 419 (citing U.S. Const. amend V. ("nor shall private property be taken for public use, without just compensation")); *Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 84 L.Ed. 240 (1939) ("For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."); *United States v. Dow*, 357 U.S. 17, 20–21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (same); *Lacey v. United States*, 219 Ct.Cl. 551, 595 F.2d 614, 619 (1979) ("The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking."). Drawing on the authorities, the court found it "axiomatic that a party must hold a compensable property interest to recover compensation for a taking." *Id.* (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) and *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). The court concluded that, absent a valid assignment of a previous owner's claim under the Assignment of Claims Act,[9] "plaintiffs' claims for damages that antecede[d] individual [property] ownership [are] barred." *Id.* at 420.

The facts in this case are analogous in relevant respects to the facts in *Applegate*. Here, plaintiffs first filed suit in July 1999 alleging that the activities of the Corps in St. Joseph Harbor between 1950 and 1989

8. FY–1999 refers to fiscal year 1999.

9. The Assignment of Claims Act provides that "[a]n assignment [or transfer of any part of a claim against the United States Government]

may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(a)-(b) (2003).

caused the erosion of their shoreline property and thereby effected a taking of their properties.[10] Plaintiffs acquired their property at various times both during and after [11] the period when the Corps installed steel sheet piling at the jetties in St. Joseph Harbor. The case law, as plaintiffs recognize, *see* Banks Opp'n at 6; Stone Opp'n at 3, does not allow recovery of damages for the alleged taking of their property prior to their respective dates of ownership. *See Danforth,* 308 U.S. at 284, 60 S.Ct. 231; *accord Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 5, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (when the United States "acquir[es] privately owned land summarily, by physically entering into possession and ousting the owner[,] ... *the owner has a right* to bring an 'inverse condemnation' suit *to recover the value of the land on the date of the intrusion* by the Government") (emphasis added) (internal citations omitted); *Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1356 (Fed.Cir.2003) ("[T]o constitute a taking, an [invasive governmental act] must appropriate a benefit to the government at the expense of the *property owner.*") (emphasis added). The case law also provides that the accrual date of a claim "fix[es] the alleged liability of the defendant." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) ("It is generally stated that a claim 'first accrues' when all the events have occurred *which fix the alleged liability* of the defendant and entitle the plaintiff to institute an action.") (emphasis added).

As determined by the Federal Circuit in *Banks II,* plaintiffs' takings claims accrued in January 2000 after the Corps concluded in a series of three reports that the damages it had sought to mitigate through various efforts begun in the 1970s were, in fact, permanent and irreversible damages. *See Banks II,* 314 F.3d at 1307, 1310. Based on the Federal Circuit's finding that the mitigation efforts of the Corps undertaken in the 1970s delayed the accrual of plaintiffs' claims until the January 2000 issuance of the Corps' 1999 report, the Federal Circuit found that plaintiffs' complaints were filed within six years of the date of claims accrual and thus were timely. *See id.* at 1310 ("Because each report was issued less than six years before plaintiffs filed their complaints, each complaint was timely."); *see also* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Within the context of (i) the thirty-nine year period, specifically from 1950 until 1989, of the Corps' construction activity in St. Joseph Harbor; (ii) the protracted mitigation efforts by the Corps in St. Joseph Harbor from the 1970s until January 2000; and (iii) the Federal Circuit's determination that plaintiffs claims did not accrue until January 2000 when the Corps issued its third report addressing the ineffectiveness of the physical mitigation efforts that it began in the 1970s, the court will examine, for liability purposes,[12] the plaintiffs' claims in the following manner:

(1) For plaintiffs who acquired their property before or within twenty years after the Corps' start of construction work in 1950 in St. Joseph Harbor, the court will hear evidence regarding the portion of the erosion damage on plaintiffs' property during their ownership caused by the activity of the Corps in St. Joseph Harbor and any information regarding the mitigation efforts by the Corps known by the plaintiffs with respect to the period prior to the begin-

---

**10.** The Banks plaintiffs initiated this action on July 9, 1999. *See* Banks Complaint at 1. In February 2000, additional plaintiffs joined the Banks action. *See* Notice of Additional Plaintiffs filed on 2/23/03. On March 1, 2004, the Stone plaintiffs filed a separate but related action. *See* Stone Complaint at 1.

**11.** At least one property may have been acquired before 1950. See App. A for a list of property acquisition dates based on filings by the Banks plaintiffs.

**12.** If liability is established in the upcoming trial, the court must conduct further proceedings to assess damages. As a matter of law, each plaintiff is entitled to " 'just compensation' [that] includes ... recovery for 'all damages, past, present and prospective,' " *Ridge Line,* 346 F.3d at 1359 (quoting *United States v. Dickinson,* 152 F.2d 865, 867 (4th Cir.1946), *aff'd,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947)).

ning of the physical mitigation efforts in the 1970s.[13]

(2) For plaintiffs who acquired their property after the Corps began its mitigation efforts in the 1970s and before the Corps completed its construction activities in St. Joseph Harbor in 1989, the court will hear evidence regarding the portion of the erosion damage on plaintiffs' property during their ownership caused by the activity of the Corps in St. Joseph Harbor.[14]

(3) For plaintiffs who acquired their property after the Corps completed its construction activities in St. Joseph Harbor in 1989 but before plaintiffs' takings claims accrued in January 2000, the court will hear evidence regarding the portion of the erosion damage on plaintiffs property during their ownership caused by the activity of the Corps in St. Joseph Harbor.

C. Date on Which the High Water Mark Is Measured

■ The property interest alleged to have been taken in this case is the shoreline property of the various landowners. As this court observed in *Kingsport Horizontal Property Regime v. United States*, 46 Fed.Cl. 691 (2000):

It is settled law that the Federal Government, under the Commerce Clause of the United States Constitution, has the power to improve navigable waterways in the interest of facilitating navigation. *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). It is equally well established, however, that navigational improvements that result in damage to private property located above the water's ordinary high-water mark can constitute a Fifth Amendment taking of property and thus render the government liable for the payment of just compensation. *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 70

S.Ct. 885, 94 L.Ed. 1277 (1950), *Owen[v. United States]*, 851 F.2d 1404 [ (Fed.Cir. 1988) (en banc) ].

*Id.* at 693.

While "[t]he law long has recognized that the right of ownership in land may carry with it a legal right to enjoy some benefits from adjacent waters," *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), a riparian landowner's rights with respect to those waters are subordinate to the federal navigational servitude, *see Alameda Gateway, Ltd. v. United States*, 45 Fed.Cl. 757, 763–64 (1999). As defendant noted in its briefing, state law may determine whether the state or a private landowner "owns the land under the bed of a navigable waterway." Def.'s Mot. at 15 (citing *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977)). But "[t]he federal navigational servitude defines the boundaries within which the government may supersede private ownership interests to improve navigation." *Alameda Gateway*, 45 Fed.Cl. at 763 (citing *Owen*, 851 F.2d at 1408, 1409).

The Supreme Court views the federal navigational servitude as "a pre-existing limitation upon [a] landowner's title." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028–29, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Based on its understanding of *Lucas*, the Federal Circuit stated in *Palm Beach Isles Associates v. United States*, 208 F.3d 1374, 1384 (Fed.Cir.), *aff'd on reh'g*, 231 F.3d 1354 (Fed.Cir.2000), that "the navigational servitude may constitute part of the 'background principles' to which a property owner's rights are subject, and thus may provide the Government with a defense to a takings claim."

Section 329.11(a) of Title 33 of the Code of Federal Regulations, which addresses the "[g]eographic and jurisdictional limits" of the

---

**13.** The list of property acquisition dates taken from the Banks plaintiffs' filings indicates that at least six parcels of property for which the plaintiffs have filed takings claims were acquired before the Corps began its mitigation efforts in the 1970s. *See* App. A.

**14.** These plaintiffs include a number of the Banks plaintiffs, *see* App. A, and the Stone plaintiffs who acquired their property in 1981, *see* Stone Opp'n at 1.

Corps' regulatory authority over rivers and lakes, states:

> Federal regulatory jurisdiction, and powers of improvement for navigation, extend laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark. Jurisdiction thus extends to the edge ... of all such waterbodies, even though portions of the waterbody may be extremely shallow, or obstructed by shoals, vegetation or other barriers.

33 C.F.R. § 329.11(a) (2004). This provision defines "[t]he 'ordinary high water mark' on non-tidal rivers" as

> the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the character of soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas.

*Id.* § 329.11(a)(1). The Code of Federal Regulations also provides that, when gradual, permanent changes in the bed of a waterbody occur "due to natural causes and are perceptible only over some period of time," similar changes to the shoreline configuration occur which affect the shoreline boundaries of the navigable waters of the United States. *See* 33 C.F.R § 329.13. The naturally occurring, permanent changes in a lake bed which affect shoreline boundaries may also impact the navigational servitude contemplated in 33 C.F.R. § 329.11.

The Corps began its activities in St. Joseph Harbor in the 1830s. *Banks II*, 314 F.3d at 1306. On January 26, 1837, Michigan became the twenty-sixth State of the Union. *See* Defendant's Response to Banks' Proposed Findings of Uncontroverted Facts as Related to the Period of Claim Examination (POCE) and the High Water Mark (HWM) (Def.'s Resp. to Banks' PFUF) ¶ 1. Plaintiffs' complaints are not based, however, on the early activities of the Corps in St. Joseph Harbor. Rather, plaintiffs' claims arise out of the alleged disruption of the littoral sand caused by the thirty-nine year activity of the Corps, beginning in 1950, to install steel sheet pilings at the piers in St. Joseph Harbor. *See* Banks Compl. ¶¶ 6–7, 12 (alleging that the Corps' installation of sand-tight sheet piling at the jetties in St. Joseph Harbor during the period of 1950 to 1989 "alter[ed] the supply of sand to the lake bed" and caused the erosion of plaintiffs' shoreline properties) (1999 Complaint in 99–4451 L); Stone Compl. ¶¶ 6–7 (alleging that the Corp's "construction and maintenance of the sand[-]tight steel sheet piling [which was installed between 1950 and 1989] significantly increased the annual rate of shoreline erosion on plaintiffs' property and damaged the lakebed"). Like the plaintiffs in *Applegate*, plaintiffs here do not seek compensation "for lands subject to the navigational servitude. Instead, they seek redress for ongoing damages allegedly caused by [the Corps' construction project]." *Applegate*, 35 Fed.Cl. at 415.

In *Owen*, the Federal Circuit held:

> The navigational servitude does not provide a blanket exception to the Takings Clause of the Fifth Amendment where improvements to navigation made by the government result in erosion to land located above *or* outside the bed of the stream *as delineated by the high-water mark at the time of the construction.*

851 F.2d at 1412 (second emphasis added). Recognizing that the government may be liable for a taking when its activities to improve navigation "result in erosion to land above or outside" of the navigational servitude, the Federal Circuit's holding in *Owen* indicates that the proper time to measure the high water mark that delineates the scope of the navigational servitude is "at the time of the [government's] construction" of the project intended to improve navigation. *See id.* The government began the construction activities in St. Joseph Harbor of which plaintiffs complain in 1950. This construction project continued for a thirty-nine year period from 1950 until 1989. Because it is "the time of construction" as contemplated by *Owen*, the period of construction between 1950 and 1989 is the proper time frame for measuring the high water mark along the eastern shoreline of Lake Michigan. It is

also true, as defendant argues, that the measurement of the high water mark, particularly with respect to the horizontal component of the navigational servitude, requires adjustment over time to account for the naturally occurring changes that affect the contours of the navigational servitude. *See* Def.'s Mot. at 12–13; *see also* 33 C.F.R. § 329.13 (2004). Accordingly, with respect to a particular plaintiff, the measure of the high water mark during this time period is the date of the particular plaintiff's property acquisition (or the date at which plaintiff can establish the high water mark that is also the date closest in time to the date of the particular plaintiff's property acquisition). Using the measured high water mark appropriate for the date of each plaintiff's property acquisition, the court will determine from the evidence introduced at trial what portion of any subsequent erosion of plaintiffs' properties is attributable to the Corps' installation of steel sheet piling in St. Joseph Harbor.

The Banks plaintiffs argue that "compensation is required where 'improvements to navigation made by the government result in erosion to land located above or outside ... the high water mark at the time of construction.'" Banks Opp'n at 8 (quoting *Applegate*, 35 Fed.Cl. at 415). While the Banks plaintiffs state that the measure of the high water mark and the effect of the navigational servitude are issues of federal law, *see id.* at 9, the Banks plaintiffs also contend that their property "is free from any navigational servitude ... because the navigational structure in question is 3.3 to 7.8 miles updrift (north) [of the plaintiffs' properties]." *Id.* at 10; *see also* Banks Reply at 2 (stating that "[t]here are no piers on plaintiffs' properties [and the navigational sovereignty] has no place in this case"). In support of their claim that "Michigan [l]aw controls," the Banks plaintiffs point to the text of 33 C.F.R § 329.11, the regulation outlining the "[g]eographic and jurisdictional limits" of the Corps' regulatory authority over rivers and lakes, which states, in part, that the "[o]wnership of a river or lake bed or of the lands between high and low water marks will vary according to state law; however, private ownership of the underlying lands has no bearing on the existence or extent of the dominant Federal jurisdiction

over a navigable waterbody." Banks Opp'n at 13 (quoting 33 C.F.R § 329.11(a)(2)). The Banks plaintiffs assert that the erosive process alleged to have effected a taking of their property is the erosion of the lake bed caused by the trapping of sand around the St. Joseph Harbor jetties that prevented the "littoral transport of sand" to the shoreline south of St. Joseph Harbor where plaintiffs' properties are located. *See id.* at 19–20; Banks Reply at 3. Based on their allegation that the Corps' activity in St. Joseph Harbor caused the "sand depr[i]vation" that eroded the lake bed and thereby effected a taking of plaintiffs' shoreline properties, the Banks plaintiffs argue that the navigational servitude "is not the issue" in this case. *See* Banks Reply at 3, 7. In effect, the court understands the argument of the Banks plaintiffs to be that the court should not consider the scope of the navigational servitude in this case because the erosive process alleged to have effected a taking of their property first occurred in the lake bed and, under 33 C.F.R § 329.11, ownership of a lake bed is governed by state law. *See* Banks Opp'n at 13, 19–20; Banks Reply at 3.

The Banks plaintiffs' argument that the effect of the navigational servitude has no application in this case appears to confuse the issue of who owns the shoreline property with the issue of whether a shoreline property owner has an actionable takings claim. As the Federal Circuit stated in *Owen*, "[I]t is not the location of the *cause* of the damage that is relevant, but the location and permanence of the *effect* of the government action causing the damage that is the proper focus of the taking analysis." *Owen*, 851 F.2d at 1412 (citation omitted). In *Owen*, the Federal Circuit acknowledged the possibility that underground erosion occurring "below the high-water mark yet outside the stream bed" of navigable water and resulting from government acts to improve navigation could constitute a compensable taking:

Since the Supreme Court in [*United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 800–01, 70 S.Ct. 885, 94 L.Ed. 1277 (1950)] expressly concluded that there was a taking when government improvements to navigation caused underground seepage

into land below the high-water mark but outside the stream bed, thus rendering the land useless, it is difficult to understand how erosion, itself a much more violent invasion than seepage, of land below the high-water mark yet outside the stream bed can never constitute a compensable taking.

*Owen,* 851 F.2d at 1416. Citing *Owen,* 851 F.2d at 1416, the Court of Federal Claims has reiterated in *Applegate* the legal principle that government-caused erosion damage to private property occurring below the high water mark and within the navigational servitude is not compensable as a taking:

> Binding precedent supports a ruling, as a matter of law, that flooding and erosion on plaintiffs' properties caused by governmental action above the [mean high-water mark (MHWM)][15] is a compensable taking. The same line of cases denies compensation to a landowner for damage to property within the broad navigational servitude held by the United States, specifically the littoral flow of sand below the MHWM.

*Applegate,* 35 Fed.Cl. at 415. (footnote added).

Whether plaintiffs were the owners of the shoreline properties as to which erosion loss is claimed in this case does not appear to be a subject of dispute by the parties. Moreover, the court has decided that the boundaries of the federal navigational servitude for the purpose of determining liability in this case are fixed by the dates of the Corps' thirty-nine year construction project in St. Joseph Harbor, *see Owen,* 851 F.2d at 1412 (date of project construction is date for measure of high water mark), and by the respective dates of the plaintiffs' acquisition of their property, *see Danforth,* 308 U.S. at 284, 60 S.Ct. 231 (property owner at the time of the taking receives compensation). The issue about which the parties disagree is whether or not the Corps' activities in St. Joseph Harbor caused some or all of the erosion damage for which plaintiffs seek compensation. At trial, the court will consider evidence from 1950 to the present of the changes to plaintiffs' shoreline properties along lake Michigan south of St. Joseph Harbor and evidence of the causes for the changes, whether natural or otherwise.

Defendant posits that the vertical component of the high water mark "is where, as a matter of feet above sea level, the mark is set," Def.'s Mot. at 17, and that the horizontal component of the high water mark reflects the "landward" movement of the mark, *id.* at 18. Defendant argues that neither the horizontal nor the vertical component of the high water mark "is a static line." *Id.* at 20. Defendant also argues that both the horizontal and vertical components affect the determination of the high water mark from which a plaintiff's erosive property loss must be measured. *See id.* at 13. Additionally, defendant argues that "erosion above the high water mark" that has been caused by natural erosive processes or by the "man-made activities" of "non-federal actors," such as the building of private groins and private revetments along the St. Joseph River, "is not chargeable against the United States." *Id.* at 12–13.

The Stone plaintiffs argue "that the time at which the high water mark is measured for analyzing what part of the total erosion [caused] by the government's actions is potentially a compensable taking is the time of 'construction' of the government project in question." Stone Opp'n at 7 (citing *Owen,* 851 F.2d at 1412). The Stone plaintiffs point out that "[t]he Federal Circuit expressly defined compensable erosion in takings cases involving the United States' navigational servitude as the erosion occurring to 'land located above or outside . . . the high water mark *at the time of construction.*" *Id.* (quoting *Owen,* 851 F.2d at 1412); *see also* Stone Reply at 3–4 ("[T]he court should analyze the vertical [high water mark] at the time of the harbor jetties' construction.").

The Stone plaintiffs contend that the date on which the high water mark should be measured to determine a plaintiff's erosive property loss caused by the activities of the

---

**15.** The court in *Applegate* uses the term "mean high-water mark" when referring to the measure described by the Federal Circuit in *Owen* as the "ordinary high water mark." *See Applegate,* 35 Fed.Cl. at 415 (citing *Owen,* 851 F.2d at 1411–12).

Corps does not necessarily define the period of time "for which a particular plaintiff is capable of recovering damages." Stone Opp'n at 8. The Stone plaintiffs and the Banks plaintiffs agree that a "plaintiff is limited in the amount of damages he or she may recover by the length of time such plaintiff has owned the property." *Id.; see also* Banks Opp'n at 7 ("Plaintiffs claim only losses ... which occurred during the period of their ownership"). The Stone plaintiffs assert that each "plaintiff is entitled to that portion of the total erosion above the highwater mark caused by the government action that occurred during plaintiff's ownership of the property." Stone Opp'n at 8. The Stone plaintiffs argue that, contrary to defendant's assertions, "no horizontal adjustment to the ordinary high water mark ... is required ... to establish the boundaries of what property is or is not subject to the [f]ederal [n]avigational [s]ervitude" because the horizontal and vertical limits of the navigational servitude are defined as the "land beneath and within the [ordinary high water mark]." Stone Reply at 3 ("[T]he case law does not discuss a 'horizontal aspect' to the [ordinary high water mark (OHWM)]. Rather, the *Owen* case makes clear that the OHWM is the vertical limit to the [n]avigational [s]ervitude.") (citing *Owen,* 851 F.2d at 1409).

The court believes that the apparent dispute between plaintiffs and defendant concerning the vertical and, particularly, the horizontal boundary of the ordinary high water mark is a dispute about terminology to describe the circumstance that a portion of the erosive loss to plaintiff's property could be a result of naturally occurring changes that generally affect the contours of the navigational servitude on the eastern shore of Lake Michigan. *See* 33 C.F.R. § 329. The court believes that is a factual dispute to be addressed through evidence at trial.

However, an unresolved legal issue to which defendant has adverted in its briefing and to which plaintiffs have not responded is whether any erosion caused by plaintiff's own efforts to mitigate damages by placing shore protection on their properties is "chargeable" to the Corps. *See* Def.'s Mot. at 12–13. By separate order, the court will schedule briefing on this issue.

III. Conclusion

For the foregoing reasons, the court must examine each plaintiff's claim during the liability phase of trial from the acquisition date of the plaintiff's property through the date of claim accrual in January 2000. To the extent that the motions for partial summary judgment filed by the Banks plaintiffs, the Stone plaintiffs and defendant urge the court to examine plaintiffs' claims during this period of time, the motions are GRANTED–IN–PART and are otherwise DENIED.

For the foregoing reasons, the court also finds that the proper date for measurement of the high water mark is, at the earliest, 1950, which is the date that the Corps began its thirty-nine year construction project of installing steel sheet pilings at the St. Joseph Harbor piers. With respect to a particular plaintiff, the proper date for measurement of the high water mark is the date of the particular plaintiff's property acquisition. To the extent that the motions for partial summary judgment filed by the Banks plaintiffs, the Stone plaintiffs and defendant urge the court to measure the high water mark from this date, the motions are GRANTED–IN–PART and are otherwise DENIED.

IT IS SO ORDERED.