**John H. and Mary E. BANKS, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Stone, Errol L. and Susan H. As Trustees of the Susan H. Stone Trust, Plaintiffs,**

v.

**The United States, Defendant.**

**Eugene J. Frett, Individually and as Trustee of the Victor J. Horvath and Frances B. Horvath Trust, Plaintiff,**

v.

**The United States, Defendant.**

Nos. 99–4451 L, 04–277 L, 05–1353
L, 05–1381 L, 06–72 L [1].

United States Court of Federal Claims.

May 26, 2006.

1. By Order dated March 15, 2005, the court consolidated the related cases for the limited purpose of addressing the liability issues in the cases. By Orders dated March 17, 2006 and May 2, 2006, the court consolidated *Frett v. United States*, No. 05–1353 L; *Bodnar v. United States*, No. 05–1381 L; and *Okonski v. United States*, No. 06–72 L into *Banks et al. v. United States*, No. 99–4451 L.

has effected a physical taking by erosion of their shoreline property, seek clarification of the high water mark or certification of the question to the Michigan Supreme Court. At issue is the extent of the United States' navigational servitude, as defined by the high water mark or ordinary high water mark, within which the United States cannot be liable for an alleged taking. Plaintiffs argue that a distinction exists between the high water mark and the ordinary high water mark. In an effort to retain "sand loss damages" and "terrestrial vegetation" as destruction for which the Corps is potentially liable, plaintiffs request the court to clarify that the ordinary high water mark, as distinguished from the high water mark, describes the proper boundary beyond which the Corps may be liable for the alleged taking, or to certify the question to the Michigan Supreme Court.

John B. Ehret, Olympia Fields, IL, for plaintiffs in Nos. 99–4451 L, 05–1381 L, and 06–72 L. Drew W. Marrocco, Washington, DC, for plaintiffs in No. 04–277 L. Eugene J. Frett, Chicago, IL, pro se in No. 03–1353 L.

Terry M. Petrie, Denver, CO, with whom were Benjamin Longstreth and Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge.

Plaintiffs, owners of property along the eastern shoreline of Lake Michigan south of St. Joseph Harbor, who allege that the United States Army Corps of Engineers (Corps)

I. Background[2]

On three occasions, plaintiffs have asked this court to define the scope of the navigational servitude—as defined by the high water mark or ordinary high water mark—enjoyed by the United States Government in an effort to determine the extent of the Corps' potential liability. On November 11, 2004, plaintiffs filed a Motion to Take Judicial Notice of the Location of the Natural Ordinary High Water Mark (NOHWM) or Alternatively to Certify the Question to the Michigan Supreme Court. Responsive briefing followed. On December 22, 2004, the court issued an order denying plaintiffs' motions and requesting briefing on the period of time over which a plaintiff's claim should be examined and the date for determination of the ordinary high water mark for a given plaintiff.

---

**2.** Plaintiffs' claim has had a long history in this court. In its initial decision in this case, the court held that plaintiffs' claims were time-barred. *Banks v. United States,* 49 Fed.Cl. 806, 826 (2001) (*Banks I*). The United States Court of Appeals for the Federal Circuit reversed, holding that plaintiffs' claims did not accrue until January 2000, the date of the issuance of the last of three reports which "collectively indicated that [the shoreline] erosion was permanent and irre-

versible." *Banks v. United States,* 314 F.3d 1304, 1310 (Fed.Cir.2003) (*Banks II*). A full recitation of the facts can be found at *Banks I,* 49 Fed.Cl. 806, *rev'd,* 314 F.3d 1304 (Fed.Cir.2003) (*Banks II*), *cert. denied,* 540 U.S. 985, 124 S.Ct. 486, 157 L.Ed.2d 376 (2003); *Banks v. United States,* 62 Fed.Cl. 778 (2004) (*Banks III*); *Banks v. United States,* 68 Fed.Cl. 524 (2005) (*Banks IV*); and *Banks v. United States,* 69 Fed.Cl. 206 (2006) (*Banks V*).

The court issued an opinion on June 23, 2005, holding that the proper period for evaluation of a plaintiff's claim is from the date of the plaintiff's acquisition of the property to the claim accrual date of January 2000, *Banks v. United States,* 68 Fed.Cl. 524, 530–31 (2005) (*Banks IV*), and that the appropriate date on which to measure the high water mark is the date of the particular plaintiff's property acquisition, but not earlier than 1950, the date the Corps began its thirty-nine year construction project at the St. Joseph Harbor pier, *id.* at 532–33. The court stated:

> [T]he period of construction between 1950 and 1989 is the proper time frame for measuring the high water mark.... Accordingly, with respect to a particular plaintiff, the measure of the high water mark during this time period is the date of the particular plaintiff's property acquisition (or the date at which plaintiff can establish the high water mark that is also the date closest in time to the date of the particular plaintiff's property acquisition).

*Id.* Indicating that the location of the high water mark in each plaintiff's case presented a question of fact, the court stated that it would, "[u]sing the measured high water mark appropriate for the date of each plaintiff's property acquisition, ... determine *from the evidence introduced at trial* what portion of any subsequent erosion of plaintiffs' properties is attributable to the Corps' installation of steel sheet piling in St. Joseph Harbor." *Id.* at 533 (emphasis added). The court also stated that "[t]he measurement of the high water mark, particularly with respect to the horizontal component of the navigational servitude, requires adjustment over time to account for the naturally occurring changes that affect the contours of the navigational servitude." *Id.* The court used the terms "high water mark" and "ordinary high water mark" interchangeably in its *Banks IV* opinion.

On August 16, 2005, plaintiffs filed a Motion to Take Judicial Notice of the Michigan Supreme Court Ruling on July 29, 2005 in *Glass v. Goeckel[,]* Docket No. 126409, requesting that the court take judicial notice of the Michigan Supreme Court ruling in *Glass v. Goeckel,* 473 Mich. 667, 703 N.W.2d 58 (2005). In *Glass,* the Michigan Supreme Court defined, for purposes of state law (and in the context of the public's right of access to private beaches), the ordinary high water mark. *See Glass,* 473 Mich. at 691–94, 703 N.W.2d at 72–73. Even though the Michigan Supreme Court in *Glass* identified factors that would "serve to identify the ordinary high water mark" under Michigan law, it also recognized that "the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact." 473 Mich. at 694, 703 N.W.2d at 73. In *Banks v. United States,* 69 Fed.Cl. 206 (2006) (*Banks V*), the court declined to take judicial notice of the decision, stating: "'[t]he federal navigational servitude defines the boundaries within which the government may supersede private ownership interests to improve navigation,'" 69 Fed.Cl. at 209 (quoting *Banks IV,* 68 Fed.Cl. at 531), while "the *Glass* decision 'does not address or decide the scope of the federal navigational servitude,'" *id.* (internal quotations omitted). In that opinion, the court also held that "[t]o the extent that plaintiffs can establish at trial that the jetties in St. Joseph Harbor caused erosion damage to their shoreline and that plaintiffs' revetments were installed to address the erosion caused by the Corps, the court concludes that any further erosion caused by the protective structures is properly viewed as a 'direct, natural, or probable result' of the activities of the Corps in St. Joseph Harbor." *Banks V,* 69 Fed.Cl. at 214 (quoting *Ridge Line, Inc. v. United States,* 346 F.3d 1346, 1355 (Fed.Cir. 2003)).

Now before the court is the Banks plaintiffs' Motion for Clarification of High Water Mark (HWM) or for Certification of the Question to the Michigan Supreme Court to Determine Property Rights Above the HWM (Pls.' Mot.), requesting clarification of the court's determination of the high water mark or certification of the question to the Michigan Supreme Court, and the following responsive briefing: Defendant's Opposition to Banks Plaintiffs' Motion for Clarification of High Water Mark and for Certification of the Question to the Michigan Supreme Court (Def.'s Resp.) and the Banks Plaintiffs' Response to Defendant Re Motion to Clarify or

Certify (Pl.'s Reply). Because federal case law uses the terms "high water mark" and "ordinary high water mark" interchangeably, the court DENIES plaintiffs' motion for clarification. In addition, because the boundary of the United States' navigational servitude as defined by the high water mark or ordinary high water mark is a question of federal law, the court DENIES plaintiffs' motion to certify the questions posed by plaintiffs to the Michigan Supreme Court and holds that the federal law defining the high water mark, ordinary high water mark, and extent of potential takings liability applies to this case.

## II. Discussion

### A. United States' Navigational Servitude

■ The United States enjoys a servitude over navigable waters pursuant to its Commerce Clause power to promote navigation. U.S. Const. art. I, § 8, cl. 3 (Commerce Clause); *see United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 627–28, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961) (*Va.Elec.*). Any alleged destruction of property located within the navigational servitude is generally not considered a taking of private property for which the United States must make compensation. *United States v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 312 U.S. 592, 596–97, 61 S.Ct. 772, 85 L.Ed. 1064 (1941) (*Chicago, Milwaukee*). To qualify as being within the servitude, the United States' use must be related to the concept of navigability, *see Kaiser Aetna v. United States*, 444 U.S. 164, 170–71, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and the Supreme Court "has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation," *id.* at 172, 100 S.Ct. 383. Accordingly, "the government may be liable for a taking when its activities to improve navigation 'result in erosion to land above or outside' of the navigational servitude...." *Banks IV*, 68 Fed.Cl. at 532 (quoting *Owen v. United States*, 851 F.2d 1404, 1412 (1988)).

### B. Clarification of Boundary of Federal Government's Navigational Servitude

Plaintiffs urge the court to adopt the ordinary high water mark, as distinguished from the high water mark, as the boundary above which all property damage attributable to the Corps would be compensable as a taking. Pls.' Mot. at 2–3. Specifically, arguing that sand, terrestrial vegetation, and fast land are property located above the ordinary high water mark, plaintiffs hope to retain sand loss damages, terrestrial vegetation damages, and fast land damages as a potentially compensable part of their claim. *Id.* at 1–3. Furthermore, plaintiffs argue that the destruction of terrestrial vegetation effected a spoliation of the evidence of the location of the ordinary high water mark. *Id.* at 2. Plaintiffs also reiterate their request that the court clarify the boundary of their property ownership by adopting the definition of "ordinary high water mark" articulated by the Michigan Supreme Court in *Glass*, 473 Mich. at 691–94, 703 N.W.2d at 72–73. *Id.* at 1–2.

Defendant argues that no clarification of the boundary of the United States' navigational servitude is necessary because the court has already ruled that the proper boundary of the United States' navigational servitude is defined by federal law, Def.'s Resp. at 1–4, and that "plaintiffs fail to articulate any specific ambiguity in the Court's orders," *id.* at 2; *see id.* at 3 n. 2. Defendant understands plaintiffs' "ordinary high water mark" terminology to refer to the ordinary high water mark as defined in by the Michigan Supreme Court in *Glass*. *Id.* at 3 n. 2. Because "[p]laintiffs' motion is, in substance, a request that the court reconsider its prior legal rulings," defendant argues, the court should not grant plaintiffs' motion because "plaintiffs present no justification for reconsideration...." *Id.* at 3.

#### 1. Location of Boundary of Navigational Servitude Presents Question of Federal Law

■ Plaintiffs suggest that the laws defining the scope of riparian property ownership, as defined by Michigan state law, govern the question of the scope of the Corps' potential liability. Pls.' Mot. at 1. However, the scope of shoreline ownership does not govern the question of the scope of the United States' navigational servitude. It is the servitude

that defines the extent of the United States' potential liability. Section 329.11(a)(2) of Title 33 of the Code of Federal Regulations states:

> Ownership of a river or lake bed or of the lands between high and low water marks will vary according to state law; however, private ownership of the underlying lands has no bearing on the existence or extent of the dominant Federal jurisdiction over a navigable waterbody.

33 C.F.R. § 329.11(a)(2) (2005). Because, for purposes of this litigation, the extent of the taking must be determined with reference to defendant's servitude, plaintiffs' ownership rights as recognized by state law are irrelevant. The court declines to reconsider its opinion in *Banks V*; the court again declines to adopt the definition of the ordinary high water mark articulated by the Michigan Supreme Court in *Glass*.

2. **"High Water Mark" and "Ordinary High Water Mark" Are Interchangeable Terms Used to Describe the Boundary of the Federal Navigational Servitude**

▮ Plaintiffs argue that a distinction exists between the high water mark and the ordinary high water mark and urges the court to adopt the ordinary high water mark to describe the boundary of the federal government's navigational servitude. Pls.' Mot at 2. Although federal regulations describe the ordinary high water mark as the boundary of the United States' navigational servitude, 33 C.F.R. § 329.11(a), federal case law is not consistent about the nomenclature, *compare Va. Elec.*, 365 U.S. at 628, 81 S.Ct. 784 (using term "high water mark" to describe boundary of navigational servitude) and *United States v. Willow River Power Co.*, 324 U.S. 499, 509, 65 S.Ct. 761, 89 L.Ed. 1101 (1945) (same) *with, e.g., Chicago, Milwaukee*, 312 U.S. at 595, 597, 61 S.Ct. 772 (describing "ordinary high water mark" as boundary). Federal case law alternates between the use of the terms "high water mark" and "ordinary high water mark" to describe the boundary of the navigational servitude, and many cases use the terms interchangeably. *See, e.g., Owen*, 851 F.2d at 1410 (using terms interchangeably in same

discussion). The court is sure, however, that, despite any distinction in nomenclature, federal case law and regulations, in their use of the different terms "high water mark" and "ordinary high water mark," refer to the same boundary. The court's interchangeable use of the terms in *Banks IV*, therefore, is consistent with federal case law. Accordingly, the court here declines to clarify the terminology as requested by plaintiffs. The court will, at trial, determine the specific location of the appropriate boundary with reference to the regulations and case law.

3. Scope of Navigational Servitude

Plaintiffs appear to request the court to determine the extent to which the Corps is potentially liable for the erosion of fast land, and for the destruction of terrestrial vegetation and sand. Federal law defines the scope of the navigational servitude as including lands located below the high water mark or ordinary high water mark. Section 329.11(a) of Title 33 of the Code of Federal Regulations provides:

> (a) *Jurisdiction over entire bed. Federal regulatory jurisdiction, and powers of improvement for navigation, extend laterally to the entire water surface and bed of a navigable water body, which includes all the land and waters below the ordinary high water mark.* Jurisdiction thus extends to the edge (as determined above) of all such waterbodies, even though portions of the waterbody may be extremely shallow, or obstructed by shoals, vegetation or other barriers. Marshlands and similar areas are thus considered navigable in law, but only so far as the area is subject to inundation by the ordinary high waters.

33 C.F.R. § 329.11(a) (emphasis added); *see also Chicago, Milwaukee*, 312 U.S. at 596–97, 61 S.Ct. 772 (defining "dominant power of the federal Government" to "extend[ ] to the entire bed of a stream, which includes the lands below ordinary high water mark"). Lands located below the ordinary high water mark, included in the scope of the United States' navigational servitude pursuant to 33 C.F.R. § 329.11(a), are called the "stream bed." The stream bed has been defined as:

That portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn.

*Chicago, Milwaukee,* 312 U.S. at 596, 61 S.Ct. 772.

 Federal law defines "fast lands" as lands above the high water mark. *Willow River,* 324 U.S. at 509, 65 S.Ct. 761; *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1105 n. 5 (Fed.Cir. 1992). Erosion of those lands is considered a taking for which compensation is due. *Confederated Tribes,* 964 F.2d at 1105 n. 5. In general, destruction by the United States of lands located within a stream bed does not constitute a taking for which compensation is due; however, when land below the high water mark supports fast land located beyond the high water mark, any fast land that is destroyed as a consequence of government action may be compensable. *Owen,* 851 F.2d at 1409–10; *cf. Kaiser Aetna,* 444 U.S. at 177, 100 S.Ct. 383.

The court declines at this juncture to define the scope of the Corps' navigational servitude beyond the general contours of the definition described above. The court will determine the scope of the navigational servitude in this case and the concomitant extent of liability for erosion alleged by a particular plaintiff with reference to the definition provided by federal law.

4. Specific Location of Boundary of Navigational Servitude For Each Particular Plaintiff Presents a Question of Fact to Be Resolved Through Evidence Presented at Trial

Plaintiffs appear to request that the court determine that the terrestrial vegetation and sand are located beyond the navigational servitude as a matter of law. The question of

the location of the high water mark for a particular plaintiff is an intensely factual question, however. Accordingly, the court declines to adopt a definition of the ordinary high water mark which encompasses all "sand loss damages" and all destruction of terrestrial vegetation. As stated in *Banks IV,* the court will, "[u]sing the measured high water mark appropriate for the date of each plaintiff's property acquisition, ... determine *from the evidence introduced at trial* what portion of any subsequent erosion of plaintiffs' properties is attributable to the Corps' installation of steel sheet piling in St. Joseph Harbor." *Banks IV,* 68 Fed.Cl. at 533 (emphasis added).

To the extent that plaintiffs allege "new factual background" regarding erosion damage as of different dates and provide evidentiary submissions in support of those new facts, the court declines to consider that evidence at this time. The evidence provided is not relevant to the location of the ordinary high water mark as a matter of law.

Plaintiffs also argue that the "destruction of terrestrial vegetation" has effected a spoliation of the evidence, so that a factual determination of the ordinary high water mark may not accurately reflect the ordinary high water mark. *See* Pls.' Mot. at 2. As stated in *Banks IV,* however, the date of determination of the ordinary high water mark is particular to a plaintiff and will reflect the date the plaintiff acquired the property, but not earlier than 1950. *Banks IV,* 68 Fed.Cl. at 532–33. Accordingly, any receding of the shoreline occurring after the date applicable to each plaintiff has no bearing on the ordinary high water mark to be determined by the court through the evidence presented at trial.

C. Plaintiffs' Request for Certification to Michigan Supreme Court

 Plaintiffs request, in the alternative, that the court certify ten questions related to the location of the high water mark to the Michigan Supreme Court.[3] The questions

---

3. Plaintiffs propose that this court certify to the Michigan Supreme Court the following questions:

1. Does the law of the State of Michigan recognize shoreline owner's property interest

plaintiffs would pose are whether Michigan law recognizes a shoreline owner's property interest in the littoral drift of sand as an appurtenance to the owner's property; whether the ordinary high water mark or the high water mark marks "the landward line of absolute ownership against Navigational Sovereignty" and whether this line falls on "the water's edge or border of the lake"; whether Michigan law recognizes a shoreline owner's property rights "as against a 5th Amendment Taking of littoral drift sand and/or river sand"; whether Michigan law recognizes the United States' navigational sovereignty "arising out of jetties in St. Joseph" and resulting in a "taking of shoreline property" in plaintiffs' area; whether Michigan law requires proportionality between property losses as a result of a taking and benefit to the public; whether Michigan law allows "taking private property without just compensation if the harbor structures are actually a hazard to navigation, and produce economic benefit to three (3) private corporations only"; and whether Michigan law allows the building of protective structures "lakeward to a point where the shore might be if unnatural interference with littoral and river sediment had not occurred." Pls.' Mot. at 5–6. Plaintiffs argue that certification is appropriate based on the United States Supreme Court's "ad-

vice to seek a certification where state law authorizes because that procedure 'allows a federal court faced with a novel state law question to put the question to the State's highest court, reducing the delay, cutting the cost and increasing the assurance of gaining an authoritative response.' " *Id.* at 5 (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)) (alterations in quotation in plaintiffs' motion). Plaintiffs propose answers to the questions based on case law already handed down by the Michigan Supreme Court. Pls.' Mot. at 6–7.

Defendant argues that the court should not certify plaintiffs' proposed questions to the Michigan Supreme Court because the questions posed by plaintiffs concern the scope of the federal navigational servitude or the Takings Clause of the Fifth Amendment of the United States Constitution, which are questions governed by federal law. Def.'s Resp. at 5–7. Additionally, defendant argues that some of the questions posed by plaintiff are irrelevant to this litigation. *E.g., id.* at 7. Defendant also argues that the questions should not be certified because, if answers are already available in the law, as plaintiffs claim, the questions "do not involve 'novel or unsettled questions of state law.' " *Id.* at 8

in the littoral drift of sand as an appurtenance to that owner's property?

2. Does the law of the State of Michigan recognize the Ordinary High Water Mark (OHWM) as the landward line of absolute ownership against Navigational Sovereignty? or

3. Does the law of the State of Michigan recognize the High Water Mark (HWM) as the landward line of absolute ownership against Navigational Sovereignty?

4. Does the law of the State of Michigan recognize the shoreline owner's property rights to the water[']s edge or border of the lake as against all others, except those exercising public trust rights.

5. Does the law of the State of Michigan recognize the shoreline owner's property rights as against a 5th Amendment Taking of littoral drift sand and/or river sand by shore perpendicular or near perpendicular piers or jetties when piers are unnecessary unscientific, non flow through and not a by-pass for sand?

6. Does the law of the State of Michigan recognize the shoreline owners' property rights as against the taking of littoral drift by dredging of river sand and distributing that sand anywhere but to the downdrift littoral zone?

7. Does the law of the State of Michigan recognize the applicability of nexus of Navigational Sovereignty arising out of jetties in St. Joseph to taking shoreline property 3.3 to 8.0 miles south in Shoreham to Grand Mere?

8. Does the law of the State of Michigan require proportionality between the property losses 3.3 to 8.0 miles and the public benefit to the economy of the St. Joseph/Benton Harbor area by virtue of the structures for navigation?

9. Does the law of the State of Michigan provide for taking private property without just compensation if the harbor structures are actually a hazard to navigation, and produce economic benefit to three (3) private corporations only?

10. Does the *NATURAL* OHWM as written in the law of the State of Michigan permit the riparian property owner's retaking (by building of protective structures) of private property lakeward to a point where the shore might be if unnatural interference with littoral and river sediment had not occurred?

Pls.' Mot. at 5–6.

 

(quoting *Arizonans for Official English,* 520 U.S. at 77, 117 S.Ct. 1055).

The court declines to certify plaintiffs' proposed questions to the Michigan Supreme Court. To the extent that plaintiffs' questions concern recognition by Michigan law of the extent of a property owner's rights in shoreline property, the questions are not relevant to the extent of the Corps' potential liability because the extent of the Corps' potential liability is governed by the scope of the navigational servitude as defined by federal law. As stated above, the property owner's right is subordinate to the federal navigational servitude. Because, for purposes of this litigation, the extent of the taking must be determined with reference to the federal navigational servitude, plaintiffs' ownership rights as recognized by state law are irrelevant.

 To the extent that plaintiffs' questions require construction of the Takings Clause of the United States Constitution, plaintiffs' questions are also governed by federal law. *Johnson v. United States,* 202 Ct.Cl. 405, 479 F.2d 1383, 1390 (1973). Any answer provided by the state court would not govern the question. Accordingly, the court also declines to certify plaintiffs' questions relating to the Takings Clause to the Michigan Supreme Court.

Finally, to the extent that plaintiffs' proposed questions raise issues and facts that plaintiffs have not argued and are beyond the scope of the litigation, plaintiffs' questions are irrelevant to the current litigation and any answer provided by the Michigan Supreme Court would not have any bearing on the litigation. For this additional reason, the court declines to certify plaintiffs' questions to the Michigan Supreme Court.

III. Conclusion

Based on the foregoing, the court holds that the scope of the United States' navigational servitude is a question of federal law and that, accordingly, the high water mark or ordinary high water mark, which defines the scope of the United States' navigational servitude, must be construed with reference to federal law. The court DENIES plaintiffs'

motion to clarify that the proper boundary marking the potential extent of the Corps' liability is the ordinary high water mark because federal case law uses the terms "high water mark" and "ordinary high water mark" interchangeably. The court DENIES plaintiffs' motion to certify plaintiffs' proposed questions, which concern questions of federal law, to the Michigan Supreme Court.

IT IS SO ORDERED.